# DECLARATION IN SUPPORT OF CIVIL COMPLAINT FOR FORFEITURE

I, Brad Schley, a Senior Special Agent with the United States Secret Service ("USSS"), being first duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have worked for the USSS since September 2001. During my tenure with the Secret Service, I have been assigned to investigate violations of federal laws, including violations of Title 18 of the United States Code, specifically those related to the passing of counterfeit United States currency, money laundering, and wire fraud. I received criminal investigative training at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the James J. Rowley Secret Service Training Center in Beltsville, Maryland, pertaining to criminal investigations of counterfeit currency, bank fraud, money laundering, wire fraud, access device fraud, and identity theft. I have conducted investigations resulting in the arrest of suspects and seizures of criminally derived property. I am an investigative and law enforcement officer of the United States, in that I am empowered to conduct investigations and make arrests for felony offenses, pursuant to 18 U.S.C. § 3056.

2. This Declaration is based upon my training and experience, as well as my personal knowledge derived from the investigation, review of reports, claims data, and public records, and information obtained from other agents or witnesses. Since this Declaration is being submitted for the limited purpose of establishing the basis for this civil forfeiture action, as set forth herein, I have not included each and every fact known to me concerning this investigation, but only those facts that I believe are necessary to



Exhibit A

establish—more likely than not—that the Defendant Property (hereafter, the "**Cryptocurrency**," or, when referencing the account from which the Defendant Property was seized, the "**Cryptocurrency Wallet**") represents property which constitutes or is derived, directly or indirectly, from proceeds traceable to violations of 18 U.S.C. § 1343 (Wire Fraud), and/or constituted proceeds of and/or were involved in, and/or used to facilitate violations of §§ 1956(a)(1)(B) (Money Laundering), 1956(a)(2) (International Money Laundering), and/or 1956(h) (Conspiracy to Commit Money Laundering), and that the **Cryptocurrency** is therefore subject to civil forfeiture to the United States.

**PROPERTY SOUGHT FOR FORFEITURE**

3. The **Cryptocurrency** includes the following assets:

| **Asset ID** | **Asset Description** |
|---|---|
| 26-USS-000097 | 249,982.20 Tether ("USDT") from Binance User ID x2524, held in the name of Yangfeng Xiang |
| 26-USS-000099 | 0.03828263 Bitcoin ("BTC") from Binance User ID x2524, held in the name of Yangfeng Xiang |
| 26-USS-000100 | 76.66767871 Ether ("ETH") from Binance User ID x2524, held in the name of Yangfeng Xiang |

The USSS seized the **Cryptocurrency**—with an approximate total value, as of March 23, 2026, of $417,031.90—pursuant to federal seizure warrants served upon Binance, a digital currency marketplace located in Seychelles. The **Cryptocurrency** had the deposit address of TAaBgTKaGiEvylt2AeZ4Fls64GrH2PiTo3 (the **Cryptocurrency Wallet**), and the investigation revealed that the **Cryptocurrency Wallet** had received proceeds from various methods of wire fraud schemes within the United States.



Exhibit A

## BACKGROUND AND CONTEXT

### Technical Definitions

4. A domain name—such as "usdoj.gov" and "cnn.com"—is a simple, easy-to-remember way for humans to identify computers on the internet, using a series of characters (*e.g.*, letters, numbers, or other characters) that correspond with a particular IP address.

5. The term "spoofed" refers to domain spoofing and involves a cyberattack in which fraudsters and/or hackers seek to persuade consumers that a web address or email belongs to a legitimate and generally trusted company, when in fact it links the user to a false site controlled by a cybercriminal.

6. A "shell company" exists primarily to conduct financial maneuvers and typically has no employees, provides no actual business or service, and offers some anonymity to the beneficial owners. Criminal entities use shell companies to establish business bank accounts so that large sums of monies can be transacted with less potential suspicion from financial institutions. Because bank accounts belonging to shell companies are frequently closed by financial institutions when victims file fraud reports, criminals often use shell companies to open accounts at different financial institutions.

### Cryptocurrency Explanations

7. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency (issued and regulated by a government, e.g., the U.S. Dollar) or other cryptocurrencies. There are thousands of



Exhibit A

different cryptocurrencies—including Bitcoin, Ether, and Tether—although many of them have zero trading activity. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[1] Cryptocurrency is not illegal in the United States.

8. Tether, abbreviated as USDT, is a cryptocurrency stablecoin. Unlike other cryptocurrencies such as Bitcoin which has an unpredictably fluctuating price, USDT pegs or "tethers" itself to the U.S. dollar in order to minimize price volatility. Payments or transfers of value made with USDT, recorded on blockchains, are not maintained by any single administrator or entity. Individuals can acquire USDT through exchanges (*i.e.*, online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), cryptocurrency ATMs, or directly from other people. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not. If, however, an individual or entity is linked to a

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.



Exhibit A

public address, the transactions conducted by that individual or entity can be determined by analyzing the blockchain, subpoenaing KYC compliance records from centralized crypto platforms, and/or heuristic clustering (grouping multiple input addresses identified as controlled by the same active participant based on transactions patterns. Consequently, while it is not completely anonymous, USDT allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems, because obtaining this information requires investigators to take additional steps.

9. Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is often used as payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

10. Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars. One bitcoin is worth approximately $63,445.40 (as of 4:20 p.m. UTC, August 12, 2026); the value of bitcoin is generally much more volatile than that of fiat currencies. According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[2] Such

---

[2] ***See*** "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," ***available at*** https://www.fincen.gov/resources/statutes-regulations/guidance/applicationfincens-regulations-persons-administering.



**Exhibit A**

exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required by state law). Registered money transmitters are also required to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity.

## FACTUAL HISTORY

### The Investigation

11. In September 2023, the USSS Tyler Resident Office began investigating a criminal money laundering syndicate which operated cryptocurrency investment scams. In particular, the unknown scammers promoted spoofed domains and websites purporting to look like legitimate cryptocurrency trading platforms to U.S.-based victims, including victims located in Tyler, Texas. Scammers then fooled victims into "investing" in cryptocurrency through these fraudulent investment platforms, enabling them to steal the victims' money.

12. This type of scam is often called "pig butchering" (derived from a Chinese phrase used to describe this scheme). Scammers spend significant time getting to know,



Exhibit A

targeting, and grooming their victims to gain their confidence. After developing a relationship and gaining trust, scammers instruct their victims to visit the spoofed domains to make significant capital investments in cryptocurrency. The victims are then typically asked to invest their funds through a specified cryptocurrency (such as BTC, USDT, or ETH) deposit address and are further told they can expect to make a sizeable return on their investments. As initial smaller investments are made, the spoofed websites falsely display a significant increase in the victim's account balance, which entices the victim to continue making investments, typically culminating in a final large deposit or transaction. When the victim attempts to make a withdrawal, the scammers attempt to delay the withdrawal while coercing the victims to make additional payments. These tactics can include requesting additional investments due to "significant profits" gained on the account or freezing the account due to fees or taxes "owed" or alleged "suspected money laundering." Regardless of how the scammers attempt to solicit additional funds from the victims, the victims are unable to retrieve any portion of their investment.

13. This syndicate used a spoofed domain (www.achainjp.vip,5, later changed to www.aczkcoin.vip) of Achain ("ACT"), a legitimate cryptocurrency with price variances of $.0012 to $1.39, whose actual domain is www.achain.com, to allow victims to view their accounts. These accounts falsely showed that the victims had each received enormous profit. Generally, victims reported they were instructed to purchase cryptocurrency, usually ETH, at a legitimate exchange such as Kraken, and then transfer the ETH to another exchange such as Coinbase. Once the ETH was in their Coinbase



Exhibit A

account, the victims were then instructed to convert the ETH to another cryptocurrency, normally USDT, and then transfer the USDT to the wallet linked to the spoofed Achain account. Once the USDT or other cryptocurrency was in their Achain account, victims reported they were able to access their account. In most cases, victims reported initially transferring small amounts to their Achain account, and some victims reported being able to withdraw funds from this smaller initial investment. However, this activity only enticed the victims to invest more of their funds and often amounts exceeding $100,000. Once the large transactions reached the Achain wallet, the victims could still access the account but were unable to withdraw their funds.

14. As of September 19, 2023, the USSS identified 36 victims who reported suffering losses as a result of a cryptocurrency investment scam involving Achain. On or about February 28, 2022 to September 8, 2023, these victims reported a total loss exceeding $14 million.

15. In the Eastern District of Virginia, USSS investigators found victims of a similar fraud scheme operating at about the same time, which was also using spoofed domains and websites purporting to look like legitimate cryptocurrency trading platforms to U.S. victims and then stealing the victims' "investments."

**The Victims**

16. Victims of this criminal syndicate's fraudulent scam report that upon their attempts to contact "customer service" for the spoofed Achain website, they were informed that in order to withdraw their funds, they needed to pay a tax of up to 35% on



Exhibit A

the amount to be withdrawn. It was at this point that most victims became aware that they had been victimized.

17. Victims K.J. and H.J., who reside in the Eastern District of Texas, reported that they were prompted to pay the 35% tax in order to withdraw their funds. K.J. and H.J. stated the scammers used WeChat and WhatsApp to communicate with them regarding their transactions and that they were first provided international wire instructions to a bank in China to pay their required tax fee. When K.J. and H.J. informed the scammers that they could not send an international wire to pay U.S. taxes, the scammers provided them with Citibank account x5912 in Elights Trading Inc. (the "Elights Account").

18. Records filed with the California Office of the Secretary of State showed that Elights Trading Inc. filed its Articles of Incorporation on or about July 26, 2023. Elights Trading's address for the account was in Hacienda Heights, California, with Fei Liao ("Liao")[3] listed as the registered agent. Citibank's records reflect that Feo Liao was the signer on the Elights Account, using the same Hacienda Heights address, which law enforcement officers confirmed that the address is in a residential area, with no readily identifiable businesses located at the Hacienda Heights address. Furthermore, investigators were not able to locate any internet presence for Elights Trading, Inc.

19. The transactions for the Elights Account indicate the account received

[3] Liao pleaded guilty to Count 2 (Conspiracy to Commit Money Laundering) in a related criminal case. *United States v. Fei Liao*, 6:24-cr-24-JCB-KNM. Liao was sentenced to 40 months imprisonment, 3 years supervised release, and ordered to pay a $100 assessment and $2,812,093.88 restitution. *See id.*, Judgment, Dkt. 60.



Exhibit A

deposits totaling approximately $2,837,132.88 beginning on or about September 7, 2023 through September 15, 2023. The table below indicates the identified remitters, date, and amount of the identified transactions:

| Date | Remitter/Victim | Amount |
|---|---|---|
| 9/7/2023 | T.G | $230,000.00 |
| 9/7/2023 | J.Z. | $120,000.00 |
| 9/7/2023 | J.S. | $100,000.00 |
| 9/7/2023 | G.C. | $93,673.88 |
| 9/8/2023 | A.P. | $660,000.00 |
| 9/8/2023 | Y.I. | $355,000.00 |
| 9/8/2023 | P.M. | $97,000.00 |
| 9/8/2023 | C.A. | $95,000.00 |
| 9/8/2023 | V.V. | $68,000.00 |
| 9/8/2023 | A.M. | $40,000.00 |
| 9/11/2023 | S.M. | $130,000.00 |
| 9/11/2023 | D.H. | $100,000.00 |
| 9/11/2023 | A.P. | $50,000.00 |
| 9/11/2023 | D.K. | $170,000.00 |
| 9/12/2023 | D.B. | $110,030.00 |
| 9/12/2024 | D.W.H. | $53,000.00 |
| 9/12/2023 | K.S. | $50,000.00 |
| 9/13/2023 | M.A.D. | $25,000.00 |
| 9/13/2023 | A.A. | $290,390.00 |

20. Investigators interviewed victim K.S. regarding his transaction of $50,000.00 to the Elights Account. K.S. stated that on or about August 7, 2023, he received a "wrong number" telephone call from a person who identified herself as Sofia Buterin using a Los Angeles County phone number. K.S. explained that Buterin befriended K.S. and they communicated daily beginning after the initial call. K.S. recounted that Buterin even provided him with a photo of a Massachusetts driver's license showing a white female with the name Sofia Dmitrievich Buterin who was born in 1991. The conversation then turned into how Buterin could assist K.S. in making



Exhibit A

money by investing in cryptocurrency. K.S. complied by initially investing $5,000.00 using the Uphold exchange—a cloud-based, multi-asset digital financial platform and centralized exchange that allows users in over 140 countries to buy, trade, and hold a wide variety of assets, including cryptocurrencies, fiat currencies, precious metals, and equities—where K.S. earned a profit in a very short time-period. Having gained his trust, K.S. then was willing to invest $50,000.00, and Buterin provided him with the banking information for Elights Trading Account at Citibank. After K.S. sent the funds to Elights Trading Inc., he was instructed to wait 2 to 3 days until a seller was located to send him USDT. K.S. waited 2 to 3 days but never received his USDT.

21. Investigators queried official driver's license records for the state of Massachusetts and discovered that Buterin's alleged driver's license was fictitious, as the driver's license number was registered to a male individual born in 1966.

22. Investigators interviewed victim D.B. regarding his transaction of $110,030.00 into the Elights Account. D.B. confirmed his transaction and that he invested in cryptocurrency using his Coinbase account and a Coinbase Application he downloaded onto his phone. D.B. funded his Coinbase account from his Bank of America account, and was just an investor, buying BTC low and selling high. D.B. explained that Coinbase's fees were expensive and consuming most of his earnings, and that Coinbase Pro, which has lower fees, is too difficult to navigate. D.B. stated that while he was using his Coinbase Application, he utilized the support button to inquire about trading with a private coin supplier to avoid expensive transaction fees and improve his return on investment. D.B. claimed that he received the instructions and

bank account information for Elights Trading Inc. from the support staff on the Coinbase Application. The following image is a screenshot D.B. provided to investigators indicating he received the bank information for the Elights Account from the spoofed Coinbase application:






Exhibit A

23. Investigators obtained permission to view D.B.'s phone that was used to access the Coinbase application. The web address displayed as "coinbass-vip.com", which was utilized to trick users into thinking they were utilizing Coinbase's legitimate platform (coinbase.com). The .vip domain name is the same type of domain name provided by EDTX victims H.J. and K.J. when they accessed domains www.achainjp.vip and www.aczkoin.vip.

24. USSS investigators obtained confirmation from known Coinbase employees who confirmed the application used by victim D.B. was not a legitimate Coinbase application and/or domain.

25. Investigators interviewed victim A.M. regarding the $40,000.00 transaction remitted to the Elights Account. A.M. belongs to a cryptocurrency investment group on the communication platform Telegram. A.M. was provided the bank account information for the Elights Account in the Telegram investment group.

26. Investigators interviewed victim T.G. regarding the $230,000.00 transaction remitted to the Elights Account. T.G. met a friend on Facebook in or about May 2023 but has never met this individual face to face. T.G.'s new female friend portrayed herself as being very wealthy, and T.G. inquired how he could invest money to earn a large and safe return. That friend provided T.G. a link to Telegram where he was led to believe he was working with employees of OKEX, a legitimate cryptocurrency exchange now known as OKX. T.G. received instructions via Telegram regarding investments, including the information for the Elights Account. T.G. believed he was purchasing options in cryptocurrency and not specific cryptocurrency coins such as BTC. T.G. has invested



Exhibit A

approximately $850,000.00 in total by sending money to bank accounts he received from the OKEX Telegram communications. T.G. has only requested small withdrawals from his investment and has received only a few thousand dollars and has not made any large withdrawal requests. One of the additional bank accounts received by T.G. included a JPMorgan Chase Bank ("JPMC") account number ending in 2181. Investigators contacted JPMC investigators who advised that this account was under investigation by JPMC.

27. Investigators interviewed victim C.A. who confirmed her $95,000 transaction to the Elights Account sent on September 8, 2023. A family friend who C.A. does not personally know and has not met contacted C.A. via Facebook messenger. C.A.'s conversation with the family friend included the subject of obtaining a significant return quickly through investments. C.A. told investigators that the family friend referred her to Elights Trading Inc. at a northeastern New York phone number to invest in cryptocurrency. Because of the referral, C.A. believed she was communicating with an Elights Trading customer service representative and/or employee. C.A. has no experience investing in cryptocurrency, so she trusted the information that Elights Trading provided. C.A. informed investigators that in her discussions with Elights Trading Inc., she was expected to receive 15 to 20% on her investment within a few days of her deposit to the Elights Account. C.A. was not provided with any account number, login credentials or other account information regarding her investment. Prior to speaking with investigators on September 26, 2023, C.A. was notified by Elights Trading Inc. that her funds would be returned to her because there was an issue with the Elights



**Exhibit A**

Account. C.A. recounted that Elights Trading Inc. instructed her to provide her bank with wire recall instructions. At the time of the interview with investigators, C.A.'s funds have not been returned to her bank account.

**Withdrawal transactions from the Elights Account**

28. Withdrawal activity in the Elights Account included bank fees and one outgoing wire transaction in the amount of $530,199.00 on September 8, 2023, sent to Paretone Capital Cayman Ltd account x1564. Paretone Capital Cayman Ltd advertises itself as an investment platform operating in Hong Kong, Singapore, and the United States, and focusing on digital assets. Other withdrawal activity was minimal and involved transactions less than $2,000.00 total.

**Fraud Proceeds Sent to the Cryptocurrency Address**

29. Subpoenaed documents from Paretone Capital Cayman Ltd show that on September 12, 2023, Paretone Capital Cayman Ltd account x1564 sent 529,668 USDT via deposit address TLbzd8jZ93pNeB8GwPrYGPoM1u1PS5B6yX ("Paretone's address") to the **Cryptocurrency Wallet** held at Binance. Documents from Binance show that Paretone's address has sent a total of six transfers of USDT (totaling approximately 2,043,614 USDT) to the Target Address for the period July 29, 2023 to September 21, 2023:

| Date | Amount of USDT | Transaction ID |
|---|---|---|
| 07/29/2023 | 15,974 | cbc01261b6e0e7e8c3be8a67dc421e807773c83ea6b7b53a74220c4dbe0c3bc9 |
| 08/03/2023 | 145,577 | ed79618c161de7f44612cbc623b7ce380d6e1053d704c008d252673ed069db7c |
| 09/12/2023 | 529,668 | 65e9371387365c26372df73509bf1dd1c5f0832 |
| 09/19/2023 | 448,720 | 84c7a4363409b6dfe454ad97e3c9affc6bbc46ca1d0c71b845a8652e7c8e97d4 |



Exhibit A

32. In addition to receiving 2,043,614 USDT from Paretone Capital, the **Cryptocurrency Wallet** additionally received a total of 6,413,807 USDT from eight separate deposit addresses that have been reported to the Internet Crime Complaint Center ("IC3"), the United States's central hub for reporting cybercrime. In all, a total of 28 complaints alleging losses of approximately $2.1 million were made to IC3 regarding these eight separate deposit addresses.

**Yangfeng Xiang**

33. Binance records confirm that the **Cryptocurrency Wallet** is associated with a Binance account registered to and owned by Yangfeng Xiang ("Xiang"), a resident of Hong Kong, China, which was opened on or about January 9, 2022. Binance's account records included an Identification Card bearing Xiang's name.

34. A review of the transactional details of the account shows that Xiang's account has received a lifetime total of approximately 107,000,000 USDT, primarily from private wallets and exchanges. The records show that the account has had cryptocurrency valued at approximately $112,000,000 transferred through it since it was opened, approximately 99% from USDT transactions. Based on this activity, the **Cryptocurrency Wallet** appears to act as a funnel account to launder fraud proceeds.

35. On November 28, 2023, the USSS submitted a freeze request to Binance for the **Cryptocurrency Wallet**. On January 17, 2024, an Eastern District of Texas Magistrate Judge issued a Federal Seizure Warrant for the **Cryptocurrency Wallet**, which was served on Binance. On March 8, 2024, Binance sent test transactions to



Exhibit A

USSS, before notifying USSS that there would be a delay in processing the remaining seizure due to a foreign law enforcement organization also investigating the account. On March 23, 2026, the USSS received a second set of transactions from Binance; and USSS received the remaining balance of the **Cryptocurrency** on April 1, 2026.

## CONCLUSION

36. Based upon my training and experience, and the facts and circumstances outlined in this Declaration, I reasonably believe that the **Cryptocurrency** identified herein as the Defendant Property is subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) on the grounds that they represent direct or indirect proceeds traceable to violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1956(h) (Conspiracy to Commit Money Laundering), and 1956 and 1957 (Money Laundering), and/or were involved in, and/or used to facilitate violations of §§ 1956 and 1957.

37. The results of this investigation support my reasonable belief that the government can meet its burden of proof that the **Cryptocurrency** represents the direct or indirect proceeds from or was involved in or used to facilitate the criminal violations described herein. This determination was made on the facts and circumstances presented above.

38. I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.



**Exhibit A**

Executed this 14 th day of August 2026,

bschley Digitally signed by bschley Date: 2026.08.14 13:59:22 -05'00'

BRAD SCHLEY
Senior Special Agent
United States Secret Service



**Exhibit A**